UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JERMERA MARQUEZ MAYO #447242          CIVIL ACTION NO. 20-cv-724

VERSUS                               JUDGE DOUGHTY

CADDO CORRECTIONAL CENTER, ET AL     MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Jermera Marquez Mayo ("Plaintiff") is a self-represented inmate who alleges that he was subjected to excessive force and denied proper medical care while housed as a pretrial detainee at the Caddo Correctional Center. The defendants are Sheriff Steve Prator, CCC Commander Rick Farris, Medical Director Sheila Wright (since retired), Health Services Manager Kelli Hayes, and Deputies Todd Remedes, Joseph Bourn, and Joey Raborn. Defendants filed a Motion for Summary Judgment (Doc. 22), and Plaintiff responded with his own Motion for Summary Judgment (Doc. 25). For the reasons that follow, it is recommended that Plaintiff's motion be denied and that Defendants' motion be granted.

**Summary Judgment Burdens**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). A dispute

is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party.  Anderson, supra; Hamilton v. Segue Software Inc., 232 F.3d 473, 477 (5th Cir. 2000).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986).  If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

This case presents the typical situation in which the defendants have moved for summary judgment, but it also presents the less common motion by a plaintiff for summary judgment.  Plaintiff, to prevail on his motion, must present evidence that would entitle him to judgment as a matter of law if it went uncontroverted at trial.  International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir. 1991).

**Excessive Force**

### A.  Introduction

On April 15, 2020, in the early days of the Covid-19 crisis, Plaintiff was among a group of inmates who refused to allow deputies to check their temperature.  Plaintiff alleges that Deputy Remedes, in response to the refusal, used his Taser on Plaintiff.  Remedes and the other defendants argue that they are entitled to summary judgment on the merits and based on a qualified immunity defense.

### B. Applicable Law

The claims of a pretrial detainee are governed by the Due Process Clause, rather than the Eighth Amendment that applies to claims by convicted prisoners. "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473 (2015). Objective reasonableness turns on the facts and circumstances of each particular case, and a court must make the determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. Id.

A non-exclusive list of factors that may bear on the reasonableness or unreasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Id.

Mere negligence by the officer will not make out a claim. Kingsley, 135 S.Ct. at 2472, citing Daniels v. Williams, 106 S.Ct. 662 (1986). But the detainee need not prove intent to punish to prevail on a claim that his due process rights were violated. He "can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Kingsley, 135 S.Ct. at 2473-74.

**C. Defendants' Evidence**

CCC Commander Rick Farris offers a declaration made pursuant to 28 U.S.C. § 1746, which is competent summary judgment evidence. He explains that on April 15, 2020, he was the Bureau Captain and was facing a serious threat to the safety of inmates due to Covid-19. An inmate in Housing Unit Alpha became ill and was hospitalized, and Farris was notified that the inmate was diagnosed with Covid-19. There were about 160-170 inmates in that housing unit, held in 64 cells, with two or three inmates in each cell. Farris states that he was aware of problems occurring at other corrections facilities with Covid-19, and he was concerned that an outbreak at CCC could spread rapidly and harm multiple inmates and members of the staff.

Farris states that the sheriff's office took multiple precautions to protect inmates and staff, including isolating exposed inmates, social distancing when inmates were out of their cells, and limiting the risk of having to use force and have "hands on" interaction between staff and inmates in the housing unit. The use of pepper spray was also restricted because fans are used to quickly remove residual spray that could affect other people, but Farris was concerned that the use of fans would spread the virus.

Farris explains that medical staff were directed to go to Housing Unit Alpha twice a day and take the temperature of all inmates and staff, rather than wait for symptoms to appear. Farris received word one night that inmates in Alpha were not allowing medical staff to examine them or take their temperatures, and they were causing a disturbance. Farris returned to CCC to address the issue personally. When he arrived, he could hear the

disturbance in Alpha from the parking lot, which included inmates yelling and kicking cell doors.

Farris states that he went to Alpha and spoke to medical staff to confirm that inmates were refusing to allow their temperature to be taken.  Farris saw inmates kicking doors and yelling, and he believes that they were angry due to Covid-19 movement restrictions. Farris states that it was critical in the setting to confirm that inmates did not have a temperature or other symptoms, but he did not want deputies to have close contact with the inmates, nor did he believe that pepper spray was an available option.  Farris explains: "I stated to ERT members, in the presence of nurses and inmates, that instead of physically grabbing and forcing inmates to comply, inmates who refused to have their temperature taken would be Tased."  He states that he "later heard a Taser deployed and saw that Deputy Remedes had tased Mayo (Plaintiff)."  Farris states that the Taser is never used as punishment, and that was not the purpose of this use.  He "believed that this force was needed under these unusual circumstances to gain compliance and allow medical staff to address this inmate in a safe way."  He adds, "Because of the hostility and excitability of the inmates during the disturbance, physical contact was more dangerous."

Deputy Remedes offers his own declaration and agrees that he was told by Commander Farris "that instead of physically grabbing and forcing inmates to comply with orders to have their temperatures taken, inmates who refused would be Tased."  Remedes states that he was standing in front of Plaintiff "and heard him say that he refused to have his temperature taken."  Remedes states that Plaintiff "refused to have his temperature taken so I tased him as ordered."  Deputy Bourn states in a declaration that he was standing

near Plaintiff and heard him say that he refused to have his temperature taken, and Bourn then heard a Taser being deployed.  Farris states that Captain Joey Raborn was not at the facility at the time of this incident.

### D. Plaintiff's Evidence

Plaintiff also offers a declaration made pursuant to 28 U.S.C. § 1746.  He agrees with Defendants that on April 15, 2020 he was housed in the Alpha unit and refused, along with several other inmates, to allow his temperature to be checked.  He states that Commander Farris entered the unit and told another officer to tell the inmates who refused to pack their belongings, but they were then told to stop packing, remove their jumpsuits, and go downstairs for temperature checks by a nurse.

Plaintiff states that his cellmate was having his temperature checked, and Plaintiff approached Deputy Bourn and put his hands behind his back and told Bourn that he refused.  Plaintiff states that he "looked back at ERT Bourn and was tased by ERT Remedes and fell straight back hitting the back of my head going unconscious for a few seconds."  Plaintiff states that he "wasn't showing any threat to be tased" before then.  Plaintiff states that he suffered a "head injury" from the fall, but his medical records and other evidence (discussed below) suggest that headaches were his only lasting effect related to the event.

### E. Analysis

Plaintiff is not entitled to summary judgment.  When a plaintiff moves for summary judgment, all facts and inferences are viewed in the light most favorable to the defendant, and all reasonable doubts are resolved in the defense's favor.  Puckett v. Rufenacht, Bromagen & Hertz, Inc., 903 F.2d 1014, 1016 (5th Cir. 1990).  When the evidence is

viewed under this standard, Plaintiff is not entitled to summary judgment on his excess force claim.

Defendants, on the other hand, have demonstrated that they are entitled to summary judgment based on their qualified immunity defense.  Plaintiff's version of the event, combined with the additional, uncontested facts offered by Defendants about the surrounding circumstances, show that Deputy Remedes used his Taser in accordance with instructions from Commander Farris that were designed to avoid the spread of coronavirus.

Farris was rightfully insistent on carefully monitoring the health of inmates.  If he had elected to allow Plaintiff and other refusing inmates to avoid temperature checks, it could have resulted in the spread of coronavirus among the inmates and staff, some of whom might have filed their own suits for Farris's failure to take adequate preventive measures.  Farris ruled out the use of pepper spray and direct physical force because of the dangers they posed of spreading the virus.  The use of a Taser could gain compliance to ensure preventive measures were taken, and it would cause risk of physical harm to only the inmate who refused to comply.

Plaintiff's facts, which must be accepted for these purposes, depict him as not actively resisting through aggressive means, but he had clearly refused to allow the temperature check, which put jail officials in a situation of using a Taser to gain compliance or allowing the inmate to avoid compliance with an important health and safety measure. There may have been other means to gain compliance, perhaps through lesser applications of force, but the record indicates that Commander Farris considered the options and issued what he believed to be reasonable instructions under the unique circumstances to gain

compliance.  Plaintiff has not pointed to any clearly established law in effect at the time of the incident that would deem the actions a constitutional violation.  Defendants are entitled to summary judgment with respect to Plaintiff's claims of excessive force.

**Medical Care**

### A. Introduction; Applicable Law

Plaintiff alleges that CCC officials did not provide him with adequate medical care following the April 15 use of a Taser on him.  "The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'"  Dyer v. Houston, 964 F.3d 374, 380 (5th Cir. 2020), quoting Thompson v. Upshur Cty., Tex., 245 F.3d 447, 457 (5th Cir. 2001). To succeed on a deliberate-indifference claim, a plaintiff must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference.  Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 755 (5th Cir. 2001).  "Deliberate indifference is an extremely high standard to meet."  Id. at 756.

### B. Summary Judgment Evidence

Plaintiff states in his declaration that, after a Taser was used on him, he was escorted to an area where a nurse removed the prongs.  Plaintiff states that he told the nurse that his head was hurting from the fall and that urine was running down his leg.  Plaintiff states that he was then taken to the booking area and placed in a holding cell without any shoes or hygiene material, and he was not seen by medical for his head injury.

Plaintiff states that on April 16, 2020, he was still housed in the booking area when Captain Raborn gave an order "not to give offender Jermera Mayo anything until he takes his temperature." Plaintiff states that he was denied a shower and hygiene material for two days before being escorted to another area and allowed a shower and clean clothes. He was then housed in a segregation unit.

Plaintiff states that he complained to the staff in the booking area about his head injury, but he was ignored. He allows that Sheila Wright came to the area on April 16 with Deputy Remedes and others for a temperature check, which Plaintiff says he agreed to based on fear of being tased again. He states that Wright ignored his injury. Plaintiff alleges that he then put in sick call requests on April 19, 22, 26, and 27. He states that he was eventually seen after eight days.

Current medical director Kelli Hayes states in a declaration that, after Plaintiff was tased on April 15, he was temporarily isolated in a cell in the booking area. He had access to a sink. Although isolated inmates are escorted to showers, Hayes states that the jail has no records confirming whether Plaintiff actually received a shower during his two days of isolation.

The medical records show that Plaintiff frequently requested and received medical attention, including a dental visit and prescriptions for ibuprofen and antibiotics. In late March 2020, Plaintiff complained of sinus problems and headache. He was prescribed cough and cold medication and ibuprofen. On March 30, his blood pressure medication was refilled, and on April 6, Plaintiff complained of headache and cough. He was given cough and cold medication, plus ibuprofen to be taken through April 19 (the Taser incident

took place on April 15). Notes show that Plaintiff refused sick call on April 14 and again on April 29. A note from May 13, 2020 indicates that Plaintiff complained of serious headaches related to being tased about one month earlier and hitting the back of his head. He was prescribed Tylenol, twice a day for two weeks, to treat his headaches. An x-ray of the skull was ordered to rule out any fractures. The medical records reflect that Plaintiff was seen a number of other times through September 2020 to address abdominal pain, high blood pressure, and other issues. There is no indication in those records of a head injury or other problems stemming from the use of the Taser.

### C. Analysis

Plaintiff does not complain that he was not given medical care for the direct effects of the Taser, and he admits that a nurse removed the prongs and examined him immediately after the incident. His only complaint is that he was not treated quickly enough for headaches stemming from the fall that followed the use of the Taser. Plaintiff submits evidence, through his declaration, that he submitted various requests for sick call that were not addressed until eight days later. The medical records indicate that Plaintiff has long suffered from headaches, perhaps related to his high blood pressure. When he was examined and treated for his headache complaint after the use of the Taser, the only treatment was Tylenol, and Plaintiff does not contend that this treatment was inadequate.

The facts, when considered together, do not depict deliberate indifference by jail officials to a serious medical need of a detainee. "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th

Cir. 2006). Minor symptoms such as headaches are not normally considered "serious medical needs" for which the constitution mandates prompt medical care. Courteau v. Larpenter, 2020 WL 2771755, *4 (E.D. La. 2020) (collecting cases).

The record also does not indicate that medical staff met Plaintiff's complaints with deliberate indifference. Plaintiff was frequently treated for a variety of medical problems, before and after this event, and he admits that he was seen by medical staff for his headache complaint within eight days after use of the Taser. This is not the sort of unnecessary and wanton infliction of pain repugnant to the conscience of mankind that is required to constitute deliberate indifference. McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997). Plaintiff is not entitled to summary judgment with respect to his medical care claim, but Defendants are entitled to summary judgment with respect to all such claims.

**Conditions of Confinement**

Plaintiff's complaints about his living conditions immediately after the use of the Taser likely fall within the scope of the medical care claim discussed above. Out of an abundance of caution, the court will separately address Plaintiff's evidence that he was kept in a holding cell for two days without shoes or hygiene material and that he was not allowed to take a shower during those two days. Defendants offer uncontested evidence that Plaintiff did have a sink in his cell.

A pretrial detainee who contests his conditions of confinement invokes the protections of the Fourteenth Amendment, but the applicable standard is the same as that for a convicted prisoner under the Eighth Amendment. Cadena v. El Paso County, 946 F.3d 717, 727 (5th Cir. 2020). The detainee may prove a constitutional violation either by

demonstrating an unconstitutional condition of confinement or by demonstrating an unconstitutional episodic act or omission.  Id.  A challenge to a condition of confinement is a challenge to a general condition, practice, or rule.  An episodic act or omission claim faults specific jail officials for their acts or omissions.  Estate of Henson v. Wichita County, 795 F.3d 456, 462-64 (5th Cir. 2015).

Plaintiff's complaints about his temporary two-day housing arrangement fall within the episodic act or omission category.  The question then is whether a defendant breached his constitutional duty to tend to the basic human needs of persons in his charge.  The official does so only when he has subjective knowledge of a substantial risk of serious harm to the detainee and responds to that risk with deliberate indifference.  Estate of Henson, 795 F.3d at 464.

Plaintiff's evidence does not present a factual scenario that would allow a jury to return a verdict against any of the named defendants with respect to this claim.  The evidence shows that Plaintiff was afforded a cell with a sink.  He presents evidence that he did not have shoes, but he does not contend that he lacked any other clothing or that he did not have standard bedding material.  His evidence suggests he went without a shower and lacked hygiene material for two days, but he does not contend that he suffered any particular problems beyond discomfort or unhappiness as a result.  The evidence does not indicate that any defendant responsible for placing Plaintiff in that cell for two days did so with a knowing disregard of an excessive risk to Plaintiff's health or safety.  Similar claims have been dismissed as frivolous or on motion practice.  Alexander v. Hamilton, 700 Fed. Appx. 381, 382 (5th Cir. 2017) (pretrial detainee's "claim regarding his alleged inability

to shower for five days fails because he has not shown that any of the defendants acted with deliberate indifference in that regard."); Hamilton v. Lyons, 74 F.3d 99, 106–07 (5th Cir. 1996) (pretrial detainee "alleges that he was denied visitation, telephone access, recreation, mail, legal materials, sheets, and showers for a three-day period … [but] none of these allegations give rise to a constitutional claim."); Velazquez v. Baker, 2021 WL 812505 (N.D. Tex. 2021) (placing pretrial detainee in segregation cell with urine on the floor and no cleaning supplies for two or three days was not unconstitutional); and Garrett v. Smith, 2021 WL 1215871, *8 (E.D. La. 2021) ("the Constitution does not require daily, or even weekly showers" for pretrial detainees).  Defendants are, therefore, entitled to summary judgment with respect to this claim.

Accordingly,

It is recommended that Plaintiff's Motion for Summary Judgment (Doc. 25) be denied.  It is further recommended that Defendants' Motion for Summary Judgment (Doc. 22) be granted and that all claims against all defendants be dismissed with prejudice.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 26th day of May, 2021.

Mark L. Hornsby
U.S. Magistrate Judge